UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT COOK, | ) | |
| DENISE GERLOSKI, | ) | |
| HEATHER GERLOSKI, a minor, | ) | |
| by and through Denise Gerloski, | ) | |
| her mother and next best friend, and | ) | |
| THOMAS GERLOSKI, a minor, | ) | |
| by and through Denise Gerloski, | ) | |
| his mother and next best friend, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 06 C 5930 |
| | ) | |
| vs. | ) | Judge Robert W. Gettleman |
| | ) | Magistrate Judge Keys |
| THE CITY OF CHICAGO, | ) | |
| A Municipal Corporation; and | ) | |
| Chicago Police Officers | ) | |
| JEROME FINNIGAN, Star 5167; | ) | |
| KEITH FUELLING, Star 13618; | ) | |
| PAUL BURG, Star 8204; | ) | |
| JENNIFER PRZYBYLO, Star 8574; | ) | Jury Demand |
| KEN ABELS, Star 1747; and | ) | |
| JOHN BLAKE, Star 454; | ) | |
| | ) | |
| Defendants. | ) | |

**FOURTH AMENDED COMPLAINT**

1.      This is an action for money damages brought pursuant to 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

2.      Jurisdiction for Plaintiffs' federal claims is based on 28 U.S.C. §§ 1331 and 1343(a).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that the claims arose in this district as alleged below.

**Parties**

4.      Plaintiffs are citizens of the United States, and residents of the City of Chicago.

5.      HEATHER GERLOSKI and THOMAS GERLOSKI are minors. On the date of the incident alleged below, HEATHER was 9 years-old, and THOMAS was 7 years-old.

6.      Defendant police officers are duly appointed and sworn City of Chicago police

officers. At all times material to this Complaint, the Defendant-Officers were acting in the course and scope of their employment, and under color of state law, ordinance and/or regulation.

7.     The Defendant-Officers are sued in their individual capacities.

8.     The CITY OF CHICAGO is a municipal corporation, duly incorporated under the laws of the State of Illinois, and is the employer and principal of the Defendant-Officers.

### Background

9.     Plaintiff ROBERT COOK is a 38 year-old male who is a fireman in the Chicago Fire Department.

10.     This case involves allegations against police officers who worked in the Chicago Police Department Special Operations Section (SOS). The incident alleged below was part of a pattern and practice of gross abuse of power by SOS officers, who essentially ran a robbery ring which entailed illegally entering person's homes; conducting illegal searches of homes, vehicles, and persons; making false arrests; stealing narcotics, jewelry, weapons, money (hundreds of thousands of dollars) and other valuables; planting drugs on innocent people; as well as physical abuse and intimidation. Indeed, in most cases that have been exposed, its been shown that SOS officers repeatedly used force, violence, threats and their guns to intimidate, terrorize, tyrannize, bully and petrify their victims – including Plaintiff.

After an alleged internal investigation that suspiciously took several years (which allowed the rogue police officers to remain on the street and continue their reign of terror), finally on September 8, 2006, four Special Operations Section officers were arrested and charged: Defendant JEROME FINNIGAN, as well as Keith Herrera, Thomas Sherry and Carl Suchocki. These officers were charged with a long list of felonies, including, *inter alia*, multiple counts of home invasion, armed violence, aggravated kidnaping, narcotics delivery, burglary, and official misconduct. The charged conduct took place over a period from about 2002 to 2005, and involved about 14 different incidents. Following the arrests, bond for Defendant JEROME FINNIGAN was set at $3,000,000.00, bond for Keith Herrera was set at $3,000,000.00, bond for Thomas Sherry was set at $2,000,000.00, and bond for Carl Suchocki was set at $1,500,000.00.

After these initial charges, the investigation continued. Numerous civilian-victims and more than a dozen police officers testified before the Cook County grand jury and implicated the SOS officers for the conduct described above. These police officers undoubtedly feared that they also would be prosecuted, and broke the sacred CPD code of silence.

2

On or about December 4, 2006, a second round of charges led to the arrest of three additional SOS officers: Frank Villareal, Margaret Hopkins, and James McGovern. In addition, even more charges were filed against JEROME FINNIGAN, Keith Herrera, Thomas Sherry and Carl Suchocki. The second round of charges were similar to the first, and included, *inter alia*, multiple counts of home invasion, armed violence, aggravated kidnaping, narcotics delivery, burglary, and official misconduct.

**Facts**

11. On or about May 28, 2002, at about 10:00 p.m., all Plaintiffs were at Plaintiff ROBERT COOK's home located at 5243 West 63rd Place in Chicago.

12. Plaintiffs were in the living room watching television.

13. At about 10:00 p.m., Defendant PRZYBYLO knocked on ROBERT's front-door.

14. After ROBERT answered the door, Defendant PRZYBYLO began asking ROBERT, "Where's the party?"

15. ROBERT told Defendant PRZYBYLO that there was not a party at his house.

16. ROBERT told Defendant PRZYBYLO that she might have the wrong street, and pointed her towards 64th Place, and then shut the door.

17. Defendant PRZYBYLO started knocking again.

18. ROBERT answered the door.

19. Defendant PRZYBYLO asked ROBERT for directions.

20. ROBERT told Defendant PRZYBYLO that she had to leave.

21. At that time, ROBERT saw another person standing outside.

22. ROBERT went to shut the door, and then Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO started pushing on the door to get in.

23. The door was partially open, and a Defendant-Officer pointed a gun through the door.

24. ROBERT was afraid that the gun would go off and hit Plaintiff DENISE GERLOSKI, or one of the children.

25. ROBERT let go of the door.

26. Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO entered Plaintiffs' home.

27. Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO did not have a

search warrant, arrest warrant, probable cause, exigent circumstances, or any other legal justification to enter Plaintiffs' home.

28.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO said that they were the police, and then ROBERT asked to see their badges.

29.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO  said they were there to arrest ROBERT and to search the house.

30.     ROBERT asked Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO if they had a warrant.

31.     ROBERT was placed in handcuffs.

32.     ROBERT was under arrest.

33.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO searched ROBERT, then pushed him and shoved him against a wall.

34.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO did not have an arrest warrant, probable cause, reasonable suspicion, consent, or any other lawful basis to stop, detain, arrest or search ROBERT.

35.     DENISE told Defendant JEROME FINNIGAN that she recognized him.

36.     ROBERT had just had a bone graft and spinal surgery, wherein four screws and two plates had been placed in ROBERT's back.

37.     Defendants FINNIGAN and FUELLING continued to be rough with ROBERT.

38.     ROBERT stated that he wanted to call 911 to get a police car to come to his house.

39.     Defendants FINNIGAN and FUELLING then threw ROBERT to the ground and repeatedly slapped him in the head.

40.     Defendants FINNIGAN and FUELLING also grabbed ROBERT's head and bent it, causing extreme pain as he was recovering from surgery.

41.     While torturing ROBERT, FINNIGAN screamed: "Who the fuck you gonna call?"

42.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO continuously screamed at the Plaintiffs, which terrified and frightened ROBERT and DENISE, and especially the children, Plaintiffs HEATHER and THOMAS.

43.     HEATHER and THOMAS were crying for much of the time that Defendants

4

FINNIGAN, FUELLING, BURG, and PRZYBYLO were in the house.

44.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO screamed at ROBERT that he was a drug addict, and that he was going to jail.

45.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO told ROBERT that they had been following him for the last three months while ROBERT was making drug deals on his motorcycle.

46.     ROBERT explained to Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO that he had broken his neck the previous August of 2001, and had not been on a motorcycle since then.

47.     ROBERT tried to tell DENISE to call 911, but Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO screamed that if she touched the phone, she would be put on the floor in handcuffs and abused like ROBERT.

48.     Hoping that somebody would hear him, ROBERT yelled for someone to call the police. As a result, Defendants FINNIGAN and FUELLING grabbed ROBERT, lifted the cuffs up, and slapped him around.

49.     Defendants FINNIGAN and FUELLING physically dragged ROBERT up the stairs to the second floor.

50.     Defendants FINNIGAN and FUELLING kept asking ROBERT: "Where's the stuff?"and, "Where's the shit?"

51.     ROBERT told Defendants FINNIGAN and FUELLING that there was nothing in his house, and again asked for a warrant.

52.     Defendants FINNIGAN and FUELLING told ROBERT that they had a dog outside, and asked ROBERT if they could bring in the dog.

53.     ROBERT told the officers that he was not giving them permission to do anything, but also told the officers that if it would get rid of the officers quicker, then they should bring the dog in.

54.     ROBERT also asked for a sergeant.

55.     Defendant FUELLING took his badge,  forcefully pushed the badge into ROBERT's head, and kept pushing ROBERT's head back until ROBERT was screaming from the pain which was exacerbated by his condition and recent surgery.

56.     Defendant FUELLING asked ROBERT if he wanted to ask for a sergeant again.

5

57.     FINNIGAN and FUELLING kept asking ROBERT who was "in control," and made ROBERT answer that the officers were in control.

58.     FINNIGAN and FUELLING repeatedly screamed at ROBERT to shut his fucking mouth, and that if he kept screaming they would really fuck him up.

59.     FINNIGAN told FUELLING to stay with ROBERT while he went to search.

60.     ROBERT was worried that FINNIGAN would plant drugs or a weapon in his home.

61.     ROBERT told DENISE to follow FINNIGAN.

62.     FINNIGAN, BURG, and PRZYBYLO then thoroughly searched Plaintiffs' house.

63.     FINNIGAN, BURG, and PRZYBYLO did not have a search warrant, probable cause, exigent circumstances, or any other legal justification to search Plaintiffs' home.

64.     While FINNIGAN was searching the house, FUELLING would repeatedly slap ROBERT and tell ROBERT that they are the police, and nobody could fuck with the police.

65.     ROBERT was also repeatedly told that if he is lucky, they would not lock him up in jail.

66.     After searching, FINNIGAN joined FUELLING, BURG, and PRZYBYLO in the room where ROBERT was being held.

67.     FINNIGAN told ROBERT: "You don't want to fuck with us. Do you know who we are? We are the fucking police. You fuck with us – you'll go to prison, you'll lose your job." While ROBERT was being told this he was repeatedly smacked and hit by FINNIGAN.

68.     FINNIGAN, FUELLING, BURG, and PRZYBYLO  would also repeatedly scream at ROBERT: Who's in charge? ROBERT would explain to the officers that they are in charge, and get smacked upon giving the answer.

69.     FINNIGAN, FUELLING, BURG, and PRZYBYLO also told ROBERT that they got friends in every police district in the city, and that they could have ROBERT pulled over anytime they wanted.

70.     FINNIGAN, FUELLING, BURG, and PRZYBYLO explained that when ROBERT got pulled over, things could happen – drugs could appear, and an officer could say, "What the fuck is this in your car?"

71.     FINNIGAN, FUELLING, BURG, and PRZYBYLO continued to tell ROBERT that they could make one phone call and ROBERT would lose his job as a Chicago fireman.

6

72.     FINNIGAN, FUELLING, BURG, and PRZYBYLO also continued to tell ROBERT that they were the police, and they had guns and they could do whatever the fuck they wanted.

73.     ROBERT understood FINNIGAN, FUELLING, BURG, and PRZYBYLO's repeated assertion that they had guns to mean that they could shoot ROBERT if they wanted to.

74.     HEATHER and THOMAS were continuously crying and screaming during the incident.

75.     Before leaving, FINNIGAN and FUELLING took ROBERT outside, bent him over a railing, and told ROBERT that they could kill him if they wanted to or needed to.

76.     FINNIGAN also repeated that stuff could appear in ROBERT's car, and ROBERT could go to prison and lose his job.

77.     While making these threats, the FINNIGAN and FUELLING were bending ROBERT over the railing backwards causing ROBERT extreme pain.

78.     Right before he left, FINNIGAN said to ROBERT that this was the last warning, and that if ROBERT made a phone call or reported what happened, ROBERT was "done."

79.     Eventually FINNIGAN, FUELLING, BURG, and PRZYBYLO left ROBERT's home.

80.     The next day ROBERT called the police to report what happened.

81.     About one day later, a so-called "investigator" from the Chicago Police Department, Defendant ABELS, came to ROBERT's home to discuss ROBERT's complaint.

82.     Defendant ABELS told ROBERT that he was in intelligence for about 20 years, and that he was an expert on law enforcement and criminal justice.

83.     Defendant ABELS was the supervising sergeant of FINNIGAN, FUELLING, BURG, and PRZYBYLO on the date of the incident.

84.     Defendant ABELS told ROBERT that he was a dirty drug dealer and that his complaint against the officers was bogus.

85.     ABELS interviewed HEATHER and THOMAS who were present, and then told ROBERT that he would investigate further and left.

86.     About a day or two later, ABELS came back to ROBERT's home and informed ROBERT that he had talked to the officers about the incident.

87.     In the meeting, ABELS asked ROBERT if he liked his job as a fireman with the

Chicago Fire Department. When ROBERT said that he liked his job, ABELS explained to ROBERT that the officers who broke in were the police and they could do what they want. ROBERT was informed that he could be pulled over while driving, and drugs could be found in his car, and ROBERT would lose everything and go to prison.

88.     ROBERT was further told that if he pursued the complaint, the police would make a phone call and he would definitely lose his job.

89.     ABELS further made it clear that they were the police,  they had guns, and they could do whatever they wanted, whenever they wanted.

90.     In the end, ABELS asked ROBERT, "So what are we going to do here?"

91.     Out of great fear and seemingly faced with no choice, ROBERT told ABELS that he would not pursue the case as long as there was an agreement that he would not be arrested, and drugs would not mysteriously appear in his car or house.

92.     ABELS told ROBERT, "I give you my word that the Chicago police will not stop you for anything, and no cops will go near your house."

93.     With that agreement, ROBERT felt that if he did not pursue the case, there would be no risk of mysteriously losing his job, or of going to prison for contraband planted in his home or car.

94.     In the alternative, ROBERT was terrified of the police, and knew that if he did pursue the case, *at a minimum* drugs would be planted, and he would be arrested and imprisoned. The investigator and SOS officers made it clear that they were the police, they had guns and could do whatever they wanted. ROBERT understood this to mean that his physical safety and life were also threatened.

95.     Before leaving, ABELS told ROBERT: "Just forget about this, otherwise kiss your job goodbye, you're going to jail, and you're fucked."

96.     ABELS closed the investigation.

97.     Defendant BLAKE approved ABELS's sham investigation.

98.     Defendant BLAKE also approved the sworn statements of FINNIGAN, FUELLING, BURG, and PRZYBYLO.

99.     This was the last that ROBERT heard about this case until 2006 when he was contacted by the Cook County State's Attorneys Office. The Cook County State's Attorneys Office and the Internal Affairs Division of the Chicago Police Department were then conducting

an investigation of FINNIGAN and other SOS police officers for the very type of misconduct that Plaintiffs allege herein.

100.    When ROBERT was first contacted by the Cook County State's Attorney's Office, he was terrified.

101.    In a telephone conversation, the investigator told ROBERT that they were investigating ROBERT's previous complaint against the officers who had broken into his house.

102.    Based on the experience of that "investigation," and the threats that ROBERT had received, ROBERT was still in fear for his safety, freedom, job and his life.

103.    After the investigator further explained to ROBERT that there was nothing to be afraid of, and that they were part of a real investigation, ROBERT was still terrified.

104.    ROBERT, in fear, ultimately told the investigator that he would *not* meet him at ROBERT's house, but would only meet him at a public place where there are a lot of people around. ROBERT suggested a parking lot at Target or Home Depot, and the investigator agreed.

105.    ROBERT went to the parking lot at the local Home Depot to meet the investigator.

106.    DENISE secretly watched the meeting from the parking lot so that she would be a possible witness to any further misconduct against ROBERT.

107.    ROBERT withdrew money from an ATM machine and brought $500 in cash to the meeting for possible bail money as he was fearful that the "investigators" may plant contraband on him or falsely arrest him.

108.    At the Home Depot parking lot, the investigators from the Cook County State's Attorney's Office tried to quell ROBERT's fear. They explained that they were investigating SOS officers, and that they were truly trying to correct what happened including the farce investigation that resulted in ROBERT being threatened and forced to not pursue his complaint.

109.    As explained above, as a result of the State's Attorney's Office investigation, FINNIGAN and several other officers were criminally charged. After the charges were filed, FINNIGAN was arrested and appeared in bond court on September 8, 2006. At this bond hearing, it was alleged that after JEROME FINNIGAN became aware of the criminal investigation, he communicated with a victim-witness to attempt to get her to lie, and even told her that if she did not lie for him, he would go to prison. Then, after he was released on bond, it has been alleged by the Cook County State's Attorney's Office that FINNIGAN sought out

information trying to learn which prosecutors were working on his case, and then made threats against a female prosecutor handling the case.

At the second bond hearing, the State's Attorney's Office alleged that after SOS officer Keith Herrera was released on bond for the initial charges, he too intimidated and attempted to tamper with a witness. The prosecution explained that while Herrera was at a nightclub in the 13th district, he approached a victim and then later followed him into restroom where he confronted the person about the criminal charges and made veiled threats. The next day, Herrera falsely reported to the police in the 8th district (where he once worked) that he was a victim of an assault at the nightclub in the 13th district.

110.    An incident of July 27, 2004, provides a good example of pattern and practice of the SOS officers. At about 4:00 pm, FINNIGAN and other SOS officers forced their way into the home of an Anthony Castro. They found a lot of narcotics, which they removed in a Nike shoe box, but did not charge Castro with possession of narcotics because he gave the SOS officers the name of a person who might have money the officers could steal.

The officers took Castro from his house to the building of the person that Castro had named. There, FINNIGAN and other officers illegally entered the residence of Jose Hermosillo and planted the drugs in his home that they had taken from Castro. Hermosillo was charged and faced a lengthy prison term. In the police reports, FINNIGAN and the other SOS officers claimed that they had seen Hermosillo running into his apartment while carrying a Nike shoe box.

Later, however, the Illinois State police crime lab found a medical bill in the shoe box that was addressed to Castro. Based on that the fraudulent case against Hermosillo was dropped.

111.    During the incident described above, DENISE recognize JEROME FINNIGAN and was familiar with his reputation.

112.    DENISE recognized FINNIGAN because she knows FINNIGAN's family.

113.    Knowing FINNIGAN, after the incident DENISE was terrified of what FINNIGAN would do if she made a complaint against FINNIGAN and the other FUELLING, BURG, and PRZYBYLO.

114.    Even after FINNIGAN was initially indicted in state court on September 8, 2006, DENISE was still in fear as FINNIGAN posted bond and was released from the Cook County Jail.

115.    On September 26, 2007, Defendant FINNIGAN was arrested by FBI agents on

federal charges of murder-for-hire. FINNIGAN was recorded planning the murder of a fellow SOS officer who FINNIGAN thought was working with the government and was going to be a witness against him in the pending criminal case. FINNIGAN was also recorded discussing the murder of three other police officers who he feared were cooperating and would testify against him.

116.     Learning that FINNIGAN had been plotting to murder persons who were coming forward with information that could be used against FINNIGAN reinforced DENISE's fear of FINNIGAN and what could happen to her if she came forward as a party to a lawsuit against FINNIGAN.

117.     Only recently has DENISE felt safe to come forward, but only after learning that FINNIGAN cannot be released on bond and will most likely receive a long prison sentence, and also that FINNIGAN may be cooperating with the federal government in their investigation of the Chicago Police Department.

118.     Each individual Defendant-Officer acted willfully, wantonly, maliciously, oppressively, and with a conscious disregard and deliberate indifference to Plaintiffs' rights.

119.     As a direct and proximate result of the acts of the Defendants described above, Plaintiffs have suffered and continue to suffer damages including loss of physical liberty, emotional distress, pain and suffering, mental anguish and humiliation, stress, anxiety, fright, mental trauma, embarrassment, and other damages.


## <u>COUNT I</u>
### (42 U.S.C. § 1983 – Unreasonable Seizure)

120.     Plaintiffs reallege paragraphs 1 through 119 as if fully set forth herein.

121.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO seized the Plaintiffs.

122.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO did not have a reasonable suspicion, based on specific and articulable facts, that Plaintiffs were about to commit a crime or had committed a crime.

123.     The seizure of Plaintiffs without reasonable suspicion or any other legal justification violated their Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be free from unreasonable seizures.

WHEREFORE, Plaintiffs ask that this Honorable Court:

a)     Enter judgment against Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO,

b)     Award Plaintiffs compensatory and punitive damages,

c)     Award attorneys' fees and costs, and

d)     Award any further relief that this Honorable Court deems just and equitable.

## COUNT II
### (42 U.S.C. § 1983 – False Arrest/Imprisonment)

124.     Plaintiffs realleges paragraphs 1 through 119 as if fully set forth herein.

125.     Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO did not have an arrest warrant, probable cause, reasonable suspicion, consent, or any other lawful basis to stop or detain the Plaintiffs.

126.     The actions of Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO in arresting Plaintiffs without any legal justification or probable cause violated their Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be free from unreasonable searches and seizures.

WHEREFORE, Plaintiffs ask that this Honorable Court:

a)     Enter judgment against said Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO;

b)     Award Plaintiffs compensatory and punitive damages, as determined at trial;

c)     Award Plaintiffs attorney's fees and costs;

d)     Award such other and additional relief that this Honorable Court deems just and equitable.

## COUNT III
### (42 U.S.C. § 1983 – Excessive Force)

127.     Plaintiff ROBERT COOK realleges paragraphs 1 through 119 as if fully set forth herein.

128.     The actions of Defendants FINNIGAN and FUELLING violated Plaintiff ROBERT COOK's Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be

free from the use of excessive and unreasonable force.

WHEREFORE, Plaintiff ROBERT COOK asks that this Honorable Court:

a)   Enter judgment against Defendants FINNIGAN and FUELLING;

b)   Award Plaintiff compensatory and punitive damages, as determined at trial;

c)   Award Plaintiff attorney's fees and costs;

d)   Award such other and additional relief that this Honorable Court deems just and equitable.

## COUNT IV
### (42 U.S.C. § 1983 – Failure to Intervene)

129.   Plaintiff ROBERT COOK realleges paragraphs 1 through 119 as if fully set forth herein.

130.   Defendants BURG and PRZYBYLO were present for the physical abuse of Plaintiff ROBERT COOK had the opportunity but failed to intervene to prevent such abuse.

131.   The actions of Defendants BURG and PRZYBYLO violated Plaintiff ROBERT COOK's Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be free from the use of excessive and unreasonable force.

WHEREFORE, Plaintiff ROBERT COOK asks that this Honorable Court:

a)   Enter judgment against Defendants BURG and PRZYBYLO;

b)   Award Plaintiff compensatory and punitive damages, as determined at trial;

c)   Award Plaintiff attorney's fees and costs;

d)   Award such other and additional relief that this Honorable Court deems just and equitable.

## COUNT V
### (42 U.S.C. § 1983 – Illegal Search of Person)

132.   Plaintiff ROBERT COOK realleges paragraphs 1 through 119 as if fully set forth herein.

133.   The actions of Defendant-Officers in searching Plaintiff ROBERT COOK's person without any legal justification or probable cause violated his Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be free from unreasonable searches and seizures.

WHEREFORE, Plaintiff ROBERT COOK asks that this Honorable Court:

a)   Enter judgment against said Defendant-Officers;

b)   Award Plaintiff compensatory and punitive damages, as determined at trial;

c)   Award Plaintiff attorney's fees and costs;

d)   Award such other and additional relief that this Honorable Court deems just and equitable.

### COUNT VI
### (42 U.S.C. § 1983 – Illegal Search of Home)

134.   Plaintiff ROBERT COOK realleges paragraphs 1 through 119 as if fully set forth herein.

135.   Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO did not have a search warrant, probable cause, exigent circumstances, or any other legal justification to search Plaintiff ROBERT COOK's home.

136.   The actions of Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO in searching Plaintiff ROBERT COOK's home without any legal justification violated his Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be free from unreasonable searches and seizures.

WHEREFORE, Plaintiff ROBERT COOK asks that this Honorable Court:

a)   Enter judgment against Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO;

b)   Award Plaintiff compensatory and punitive damages, as determined at trial;

c)   Award Plaintiff attorney's fees and costs;

d)   Award such other and additional relief that this Honorable Court deems just and equitable.

### COUNT VII
### (42 U.S.C. § 1983 – Substantive Due Process, Arbitrary Abuse of Power)

137.   Plaintiffs reallege paragraphs 1 through 119 as if fully set forth herein.

138.   The conduct described above was an egregious arbitrary abuse of government power that shocks the conscience.

WHEREFORE, Plaintiffs ask that this Honorable Court:

a)   Enter judgment against Defendants FINNIGAN, FUELLING, BURG, and PRZYBYLO;

b)   Award Plaintiffs compensatory and punitive damages, as determined at trial;

14

c)      Award Plaintiffs attorney's fees and costs;

d)      Award such other and additional relief that this Honorable Court deems just and equitable.

## COUNT VIII
### (42 U.S.C. § 1983 – Civil Conspiracy)

139.    Plaintiffs reallege paragraphs 1 through 119 as if fully set forth herein.

140.    Defendants FINNIGAN, FUELLING, BURG, PRZYBYLO, ABELS, and BLAKE knowingly and intentionally schemed and worked together in the common plan to illegally enter Plaintiff's home, illegally arrest, search and physically abuse Plaintiffs, and to cover it up.

WHEREFORE, Plaintiffs asks that this Honorable Court:

a)      Enter judgment against Defendants FINNIGAN, FUELLING, BURG, PRZYBYLO, ABELS, and BLAKE;

b)      Award Plaintiffs compensatory and punitive damages, as determined at trial;

c)      Award Plaintiffs attorney's fees and costs;

d)      Award such other and additional relief that this Honorable Court deems just and equitable.

## COUNT IX
### (42 U.S.C. § 1983 – *Monell* Claim against the City of Chicago)

141.    Plaintiffs reallege all of the above paragraphs and counts, as if fully set forth herein.

142.    At all times material to this Complaint, there existed in the City of Chicago the following practices, policies and customs:

a.      stopping, detaining, arresting, and searching civilians without a warrant, probable cause, reasonable suspicion, consent, or any other legal basis;

b.      searching civilians' homes without a warrant, probable cause, reasonable suspicion, consent, or any other legal basis;

c.      arbitrary use of excessive force against arrestees, detainees and other civilians;

d.      denial of substantive due process, abuse of legal process, malicious prosecution, and filing of false charges against innocent persons;

15

e.      mental abuse, oral abuse and assault of arrestees, detainees, and other civilians;

f.      preparing false and incomplete police reports to cover up police misconduct including unconstitutional searches and seizures;

g.      not preparing police reports, and false denial that an incident of misconduct even took place, in attempt to suppress and conceal police misconduct including unconstitutional searches and seizures,

h.      filing false charges and pursuing baseless prosecutions in order to protect police officers from claims of improper conduct and avoid liability;

i.      a *code of silence* in which police officers fail to report police misconduct including the type of misconduct alleged by Plaintiff in this Complaint, and described in sub-paragraphs a - h above;

j.      said *code of silence* also includes police officers either remaining silent or giving false and misleading information during official investigations to cover up misconduct, and protect themselves and other officers;

k.      failure to adequately train, supervise and discipline police officers in the categories and fields of police work addressed in sub-paragraphs a - h above;

l.      failure to adequately train and supervise police officers to rectify the malfeasance described in sub-paragraphs a - h above;

m.      failure to adequately investigate citizen complaints against police officers for the type of misconduct alleged by Plaintiff in this Complaint, and described in sub-paragraphs a - I above;

n.      failure to adequately discipline police officers for the type of misconduct alleged by Plaintiff in this Complaint, and described in sub-paragraphs a - I above;

o.      through the Office of Professional Standards (OPS), conducting inherently deficient investigations of citizen complaints of police misconduct in which an officer is disciplined in a minuscule percentage of cases, thereby encouraging even more police misconduct;

p.      failure to deter police officers from the type of misconduct alleged in this Complaint, and described in sub-paragraphs a - I above, by its lack of discipline for police misconduct, and defective OPS investigations.

143.    The actions of the Defendant-Officers as alleged in this Complaint were done pursuant to, and as a result of, one or more of the above *de facto* practices, policies and customs of the City of Chicago, the Chicago Police Department, and its police officers.

144.    One or more of the following entities, authorities and officials are responsible for the policies, practices and customs alleged above: the Mayor of Chicago, the City Council, the aldermen, the Chicago Police Department, the Chicago Police Board (to which the City of Chicago has delegated *de jure* final policy-making authority for the Chicago Police Department); the members of the Chicago Police Board, the Office of Professional Standards, and Superintendent Phil Cline (to whom the City of Chicago has delegated *de facto* final policy-making authority for the Chicago Police Department regarding the matters complained of herein).

145.    The practices, policies and customs described above are widespread, permanent and well-settled, and were known, or should have been known, to the municipal policy-makers of the City of Chicago.

146.    The municipal policy-makers of the City of Chicago acted with deliberate indifference to the rights of Plaintiffs in maintaining, overlooking and preserving the unconstitutional practices, policies and customs delineated above.

147.    By their inaction and failure to correct the above-described practices, policies and customs, municipal policy-makers tacitly approve and thus indirectly authorize the type of misconduct Plaintiff complains of herein.

WHEREFORE, Plaintiff asks that this Honorable Court:

a)    Enter judgment against the City of Chicago;

b)    Award Plaintiff compensatory damages, as determined at trial;

c)    Award Plaintiff attorney's fees and costs;

d)    Award such other and additional relief that this Honorable Court deems just and equitable.

## COUNT X
### (Indemnification Claim pursuant to 745 ILCS 10/9-102)

148.    Plaintiffs reallege all of the above paragraphs and counts as if fully set forth herein.

149.    The acts of the individual Defendant-Officers described in the above claims were willful and wanton, and committed in the scope of their employment.

150.    Pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/9-102, Defendant CITY OF CHICAGO is liable for any judgments in this case arising from the actions of the Defendant-Officers.

WHEREFORE, Plaintiffs ask that this Honorable Court order Defendant CITY OF CHICAGO to indemnify the Defendant-Officers for any judgment entered in this case arising from the actions of the Defendant-Officers.

**Plaintiffs demand trial by jury on all counts.**

Respectfully submitted,

/s/ Lawrence V. Jackowiak
*Counsel for the Plaintiff*

Lawrence V. Jackowiak
Louis J. Meyer
Daniel P. Kiss
Law Offices of Lawrence V. Jackowiak
20 North Clark Street - Suite 1700
Chicago, Illinois 60602
(312) 795-9595